789 F.2d 497
 24 ERC 1273, 4 Fed.R.Serv.3d 1213, 16
Envtl. L. Rep. 20,708
 UNITED STATES of America, Plaintiff-Appellee,
and
The People of the State of Illinois, Intervenors-Appellees,
v.
OUTBOARD MARINE CORP., Defendant, Third-Party Plaintiff and
Cross-Claim Defendant-Appellant,
and
Monsanto Company, Defendant, Third-Party Defendant and
Cross-Claim Intervenor-Appellant.
 No. 85-1584.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 11, 1985.
Decided April 22, 1986.
As Amended on Denial of Rehearing and Rehearing In Banc May 22, 1986.
 
 Richard J. Phelan, Phelan, Pope & John, Robert E. Shapiro, Kirkland & Ellis, Chicago, Ill., for appellants.
 James P. White, Asst. U.S. Atty., Anton Valukas, U.S. Atty., Chicago, Ill., for appellee.
 Before BAUER and COFFEY, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 COFFEY, Circuit Judge.
 
 
 1
 The appellants, Outboard Marine Corporation ("OMC") and Monsanto Company ("Monsanto") appeal a district court order granting the motion of the United States and the State of Illinois dismissing their action against the appellants without prejudice, pursuant to Fed.R.Civ.P. 41(a)(2),[1] on the condition that the United States and State of Illinois agree to execute a covenant not to again sue the appellants for injunctive relief. We affirm.
 
 
 2
 * This case has a lengthy and tangled history spawning numerous decisions by this and other courts. See Outboard Marine Corp. v. Illinois, 453 U.S. 917, 101 S.Ct. 3152, 69 L.Ed.2d 1000 (1981) (Mem.); Outboard Marine Corp. v. Thomas, 773 F.2d 883 (7th Cir.1985); State of Illinois v. Outboard Marine Corp., Inc., 680 F.2d 473 (7th Cir.1982); State of Illinois v. Outboard Marine Corp., 619 F.2d 623 (7th Cir.1980). It is unfortunate that we are unable to write the final chapter at this time and thus the conclusion of this case will have to await another day.
 
 
 3
 A. Procedural History.
 
 
 4
 OMC manufactures outboard motors, industrial and turf care vehicles at its industrial complex located adjacent to the Waukegan Harbor in Waukegan, Illinois. In 1976, the government determined that an estimated 1.1 million pounds of polychlorinated biphenyles ("PCB") rested on the bed of the harbor and were caused by fluids discharged from the OMC plant. Monsanto had been selling the PCB based fluids to OMC for use in its production and manufacturing process.
 
 
 5
 In March, 1978, the United States Government filed a civil lawsuit against OMC requesting mandatory injunctive relief under the Refuse Act, 33 U.S.C. Sec. 407 (Count I), the Clean Water Act, 33 U.S.C. Sec. 1251 et seq. (Count II) and the federal common law tort of nuisance. The government sought to compel OMC to remove the PCB sediments from the Waukegan Harbor. In November, 1978, OMC filed a third-party complaint against Monsanto seeking contribution and indemnity if OMC was required to remove the PCB sediments. Subsequently, the United States amended its complaint in 1980 to include Monsanto as a defendant and at this time the State of Illinois was granted leave to intervene as a plaintiff in this action.[2]
 
 
 6
 In December, 1980, the President signed into law the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") 42 U.S.C. Sec. 9601 et seq., better known as the "Superfund" Act, authorizing the Environmental Protection Agency ("EPA") to take action to clean up hazardous waste sites. Pursuant to section 106 of CERCLA, 42 U.S.C. Sec. 9604, the EPA is authorized to file an action in federal court to "secure such relief as may be necessary" if the agency "determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual threatened release of a hazardous substance from the facility...." On January 6, 1982, the EPA filed its amended complaint including, along with its other claims based on the federal statutes and federal common law theories of liability, a claim under section 106 of CERCLA requesting that the court order OMC and Monsanto to remove the PCB from the Waukegan Harbor. In September of 1982, in response to the appellants' request for admissions of fact, the government stated that it had no scientific concrete proof, at that point in time, that the PCB in the Waukegan Harbor had caused harm to any human being. It is important to note that the government did not admit that the PCB would not present a potential threat to human beings in the future; nor did the government admit that the PCB in the harbor would not pose a risk of future significant environmental damage to the environs of the harbor, Lake Michigan and the fish and aquatic life in that area.[3]
 
 
 7
 On May 24, 1982, the district court granted OMC's and Monsanto's motion to dismiss the federal common law nuisance claims in light of the Supreme Court's decision in Milwaukee v. Illinois, 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981) (holding that the federal common law nuisance action was preempted by the Federal Water Pollution Control Act Amendments of 1972), and granted Monsanto's motion to dismiss all other claims of the United States against Monsanto. See United States v. Outboard Marine Corp., 549 F.Supp. 1032 (N.D.Ill.1982). The district court refused to dismiss the Refuse Act and the Clean Water Act claims against OMC (Counts I and II) holding that these statutes authorized the government to seek injunctive relief for the removal of the hazardous substances, such as PCB, from the Waukegan Harbor. See United States v. Outboard Marine Corp., 549 F.Supp. 1036 (N.D.Ill.1982). The district court also refused to dismiss the section 106 CERCLA claim against OMC. United States v. Outboard Marine Corp., 556 F.Supp. 54 (N.D.Ill.1982).[4]
 
 
 8
 On November 10, 1982, OMC filed a motion requesting the district court to reconsider its order denying OMC's motion to dismiss the Refuse Act, the Clean Water Act and the Section 106(a) CERCLA claims. In response to this motion, the district court judge noted that she had "about a sixty percent comfort in my prior opinion" and set a hearing date on OMC's motion. District Court Hearing November 12, 1982 at 12-13.
 
 
 9
 Subsequently, in December, 1982, the EPA published its initial National Priority List ("NPL") and ranked the Waukegan harbor 82nd of 540 hazardous waste sites included on the NPL. Shortly thereafter the State of Illinois designated the Waukegan harbor as its top priority "Superfund" site.[5] At this time in the litigation history of this case, the United States determined that given the amount of discovery still to be completed before trial, and the fact that the anticipated lengthy trial and the subsequent appeal "will likely delay the implementation of remedial work at the OMC site and in Waukegan harbor for an additional three to four years," the most expeditious manner in which to clean up the PCB now resting on the bed of the Waukegan harbor would be for the government to remove the PCB, as authorized by section 104 of CERCLA, 42 U.S.C. Sec. 9604, and later sue for the removal and cleanup costs pursuant to section 107 of CERCLA, 42 U.S.C. Sec. 9607. On February 25, 1983, the United States filed a motion with the court to dismiss its claim under section 106 of CERCLA without prejudice; and on March 22, 1983 the government filed a motion requesting that the court stay the remainder of injunctive relief action pending the completion of the EPA administrative proceedings under CERCLA. The appellants objected to the stay and the proposed dismissal of the action without prejudice contending, as they do on appeal, that the true reason the government commenced the administrative proceedings under CERCLA was that it would be unable to establish its claims at trial. Subsequently the parties agreed to ask the district court to stay the consideration of these motions until after the EPA had issued its final plan concerning the proposed cleanup of the Waukegan harbor. The district court granted the motion to stay the proceedings. During the next year, from March, 1983 to May, 1984, the EPA proceeded with its administrative hearings and procedures, and conducted feasibility studies into the cleanup of the Waukegan harbor.[6] On May 15, 1984, the EPA issued its Record of Decision ("ROD") selecting as the appropriate remedy (given the limited availability of federal funds) a $21 million removal effort involving the dredging of the harbor with both off-site and on-site storage of the PCB contaminated sediments.[7] On May 21, 1984, approximately one week after the issuance of the ROD, the United States filed a motion with the district court, pursuant to Fed.R.Civ.P. 41(a)(2), requesting that its complaint be dismissed without prejudice as it had decided that when balancing the years of anticipated litigation concerning the issue of injunctive relief against the need for immediate removal of the PCBs from the harbor, the scales of justice were definitely tilted in favor of the government proceeding without delay to remove the PCB pursuant to the authority granted the government in CERCLA section 104 and later sue for reimbursement of the removal costs under CERCLA section 107. Both OMC's and Monsanto's briefs, filed with the court opposing the motion to dismiss, argued that it would be improper to dismiss the case without prejudice at this late stage in the litigation given the amount of money already expended in preparation for trial; they also attacked the proposed remedy recommended in the EPA's R.O.D. and the alleged weakness of the government's evidence as to the harm caused by the PCB. OMC and Monsanto requested the court to either set the case for trial on the issue of the alleged harm caused by the PCB and the cost-effectiveness of the proposed solution or, in the alternative, dismiss the case with prejudice.
 
 
 10
 B. District Court Decision.
 
 
 11
 The district court determined that "[t]his litigation undoubtedly has been very costly for the parties to litigate" and thus "[t]he United States should not be permitted, at some future time, to move backward and return to its original approach to the problem." United States v. Outboard Marine Corp., 104 F.R.D. 405, 410 (N.D.Ill.1984). The district court initially dismissed the counts contained in the government's complaint requesting injunctive relief with prejudice, but with the caveat that dismissal would be "without prejudice to a future cost-recovery suit," in the event the government should decide to commence such an action. Id. at 410-11. The district court also rejected OMC's and Monsanto's request for a bifurcated trial on the issues of the extent of harm inflicted from the presence of PCBs in the Waukegan harbor and the proposed removal remedy ruling that this would necessitate a pre-removal judicial review of the EPA's Record of Decision. The court found that such review is not contemplated in the statutory scheme of CERCLA, sections 104 and 107, until such time as the United States sues for recovery of the sums expended for the removal of the PCB. Id. at 411. The court also noted that even if it denied the government's motion to dismiss the injunctive action, and ruled in favor of OMC on its motion to reconsider the dismissal of the government injunctive relief claims, this "would not bar [the government from pursuing] a future cost recovery action" since this claim "could not have been brought in this [injunctive relief] action" and "the court does not understand the OMC or Monsanto to argue otherwise." Id. at 410-411. The court further stated that even if it allowed the case to proceed to trial, resolution of the section 106 CERCLA claim in OMC's favor would not bar a subsequent cost recovery action since the requirements of establishing liability under the respective statutes are vastly different and totally unrelated. Id. at 412.[8]
 
 
 12
 After publication of the decision dismissing the claims for injunctive relief, Outboard Marine Corporation filed a motion with the court to reconsider its ruling arguing that the dismissal of the injunctive counts in the government's complaint with prejudice barred the cost recovery suit based upon the principles of res judicata. In its motion responding to OMC's request for reconsideration, the United States suggested that in order to preserve the intent of the district court's decision and "to avoid any question of res judicata effect on the cost-recovery claim, while still protecting defendants from repetitive litigation" the court should dismiss the government's action requesting injunctive relief and civil penalties without prejudice "on the condition that the government stipulate to refrain from reinstating the pending claims for injunctive relief and penalties asserted in Second Amended Complaint." The district court adopted this recommendation and dismissed the suit without prejudice conditioned upon the United States and the State of Illinois each executing a covenant not to sue the appellants except for a possible cost-recovery action arising from the presence and removal of PCB in the Waukegan harbor.
 
 
 13
 The issue on appeal is whether the district court abused its discretion in dismissing this action without prejudice on the basis that the United States and the State of Illinois execute a covenant not to sue OMC for injunctive relief.
 
 II
 
 14
 The dismissal of the plaintiff's complaint without prejudice, pursuant to Fed.R.Civ.P. 41(a)(2), is within the sound discretion of the district court and may be reversed only if the appellant demonstrates the district court abused its discretion. Tyco Laboratories, Inc. v. Koppers Co., Inc., 627 F.2d 54 (7th Cir.1980); Stern v. Barnett, 452 F.2d 211, 213 (7th Cir.1971); 9 C. Wright & A. Miller, Federal Practice & Procedure Sec. 2364, at 161-62 (1971). The district court abuses its discretion only when it can be established the defendant will suffer "plain legal prejudice" as the result of the district court's dismissal of the plaintiff's action. See Tyco, 627 F.2d at 56. In Pace v. Southern Express Co., 409 F.2d 331 (7th Cir.1969), we delineated several factors for courts to consider in determining whether the defendant has suffered "legal prejudice" as a result of the dismissal of an action without prejudice.
 
 
 15
 "[T]he defendant's effort and expense of preparation for trial, excessive delay and lack of diligence on the part of the plaintiff in prosecuting the action, insufficient explanation for the need to take a dismissal, and the fact that a motion for summary judgment has been filed by the defendant."
 
 
 16
 Id. at 334. However, as we noted in Tyco, "[t]he enumeration of factors to be considered in Pace is not the equivalent to a mandate that each and every factor be resolved in favor of the moving party before dismissal is appropriate. It is rather simply a guide for the trial judge, in whom the discretion ultimately rests." Tyco, 627 F.2d at 56. As noted in Kern v. TXO Production Corp., 738 F.2d 968 (8th Cir.1984), "[t]he very concept of discretion presupposes a zone of choice within which the trial court may go either way [in granting or denying the motion]." Id. at 971. The issue before this court is whether the district court abused its discretion in dismissing this action without prejudice or whether the court's decision fell within the permissible "zone of choice" available to a district court properly exercising its discretion.
 
 
 17
 1. Justification for dismissal without prejudice.
 
 
 18
 As noted in Pace, the court may consider the plaintiff's proffered excuse in its assessment of whether the dismissal without prejudice is proper. See also Tyco Laboratories, Inc., 627 F.2d at 57. Appellants initially argue that the government has failed to provide sufficient justification for pursuing its present remedy of removing the PCB sediments and later suing to recover the costs resulting from the removal rather than pursuing the action then pending seeking injunctive relief. Specifically, they note that since 1972 the government has had the authority under the Clean Water Act to remove the PCB and sue the responsible party for the removal costs, see 33 U.S.C. Secs. 1259, 1265 and 1321, yet the EPA has consciously decided to bypass this route in favor of suing for injunctive relief requiring OMC to remove the PCB from the Waukegan harbor. Appellants also argue that the true reason "for EPA's change of position is that this litigation has disclosed the weakness of [the government's] position on both the legal and factual issues ..." in this case. OMC's Br. at 25. In regard to the legal issue, OMC states that "[a]s the district court indicated in its August 30 opinion, OMC's motion to reconsider the court's denial of its previous motion to dismiss presented potentially dispositive arguments against the court's prior rulings," and thus OMC maintains that the court's August 30 opinion revealed to the government that it was in danger of having its injunctive relief action dismissed on the basis of OMC's legal arguments. OMC also states that the "factual case fared no better" since the EPA would have been unable to prove at trial that the PCB resting on the bed of the harbor posed an immediate threat to human health or that any alleged harm justified the anticipated cost of removal. Id. at 25-26.
 
 
 19
 The appellants essentially charge that the government was afraid it would be unable to prevail at trial and thus was acting with less than a sincere motive in requesting that the court dismiss its action without prejudice in order that it might remove the PCB from the harbor and later sue for the cost of removal. From our review of the record we are convinced that balancing the delay pending the years of anticipated litigation over injunctive relief against the overwhelming interest of the government in protecting the environment from further irreparable damage to the water and marine life and in protecting citizens from the potential harmful effects of PCB (for example, eating salmon or other fish contaminated with PCB) justifies the government's decision to proceed with the immediate removal of the PCB sediments and possibly sue at a later date for the removal costs. Specifically, in December 1982, the EPA published its National Priority List and ranked the Waukegan harbor 82nd out of 540 hazardous waste sites throughout the United States. The State of Illinois EPA designated the harbor as the top priority hazardous waste site located in the State of Illinois. Given this level of priority established by two public agencies with expertise in environmental problems, the EPA determined that it would be in the public interest to implement the immediate removal of the PCB sediments from the harbor rather than waiting for this case to proceed through the anticipated prolonged litigation process of years upon years. For this reason, the United States requested a stay of this action in early 1983, and commenced the required administrative proceedings, authorized under 42 U.S.C. Sec. 9604(b), before proceeding with the cleanup of the harbor. Once the administrative process was completed, the EPA issued its ROD in May 1984 and moved the court for a dismissal of its actions seeking injunctive relief.
 
 
 20
 The appellants argue that the government was empowered to clean up the harbor and then sue for the removal costs pursuant to the provisions contained in the Clean Water Act and thus we should reject the government's reasons for pursuing its own cleanup action under the new Superfund Act, CERCLA. The Congress has given the EPA the discretion to determine how best to economically and feasibly expend the government's limited resources in remedying the pollution problems at the hazardous waste sites. CERCLA was enacted in order to provide the required funds to enable that the EPA to act promptly to remove the hazardous waste. See S.Rep.No. 96-848, 96th Cong., 2d Sess. 8. Congress even recognized that the remedial cost to clean up all the potential hazardous waste sites in the country far exceeded the amount of funds allocated to the Superfund. State of Ohio v. Georgeoff, 562 F.Supp. 1300, 1313 (N.D.Ohio 1983) (citing comments in the Congressional record noting that the anticipated cost of cleanup of the toxic waste sites far exceeded the amount of money allocated to the Superfund). Thus, given the limited funds available for the clean up of the hazardous waste sites, the government would certainly prefer that the responsible parties clean up the site in the most expeditious manner rather than saddle the taxpayers with the expense of removing the hazardous waste dumped into the harbor by OMC and Monsanto until such time as the government might bring an action to collect the funds from the responsible party for the cleanup. The EPA possessed the discretion to decide that the gravity of the problem (as revealed by the NPL and Illinois ranking given the Waukegan harbor site) necessitated immediate action and that it would be in the public interest to expend government resources to remove the PCB sediment rather than wait for the endless litigation of this case to take its natural course.
 
 
 21
 Further, we are puzzled by the appellant's contention that the government has not offered a legitimate reason for requesting a dismissal without prejudice (except for the covenant not to sue), arguing that the government could have cleaned up the PCB pursuant to the Clean Water Act. Essentially the appellants infer that the government could have already removed the PCB pursuant to the Clean Water Act and that if it had, the parties would not be in their present position, namely--still in court, not having as of this time gone to trial, and the PCB not having as of this time been removed from the harbor. The appellants have fought the government every possible inch of the way for over six years in court concerning the validity of the proposed injunctive relief action and whether the State of Illinois was a proper party to this action. A major reason why the PCB problem has not been resolved at this point in time is the continuous and protracted litigation of this case. While we do not fault the appellants for exercising their constitutional right to defend this action in the manner they believe is most appropriate, it is "too late in the day" for them to complain that they somehow have been prejudiced by the delay in this case in proceeding to trial for they actively participated in this litigation nightmare which we are sad to say is far from its final chapter. It was the protracted litigation of this case, and the anticipated lengthy appeals process sure to follow a trial on the injunctive relief claims, that caused the government to request the court to dismiss this action in order that it might proceed to clean up the potentially dangerous PCB and sue for the costs at a later point in time. Thus, the government has offered a legitimate reason for its abandonment of its injunctive relief action in favor of pursuing its remedies under sections 104 and 107 of CERCLA.
 
 
 22
 Monsanto, in its brief, explicitly argues that the government's motion to dismiss "comes after excessive delay and lack of diligence." Monsanto Br. at 18. However, Monsanto has failed to point to any specific instances in the record from which this court might conclude that the United States government acted in bad faith or caused unwarranted delays in this case. Further, as noted above, part of the delay in this case was caused by the defendants challenging the State of Illinois intervention before the district court and this court, fighting the government's theory that it could bring an action for injunctive relief, and agreeing with the government that this case should be stayed pending the results of the EPA administrative studies hearings (that lasted well over a year). Thus, they knowingly and actively participated in the delay by contesting the government's position taken throughout this litigation, obviously in the hope of postponing the day of reckoning as long as possible. The argument that the government caused the "excessive delay" in this case is without merit.
 
 
 23
 2. Pending disposition of this case.
 
 
 24
 Appellants also argue that had the government not been allowed to dismiss this case without prejudice, OMC may have been able to obtain a ruling from the district court dismissing the government's action seeking injunctive relief for failure to state a claim. This argument, however, is at best highly speculative and conjectural. The appellants rely on Pace v. Southern Express Company, 409 F.2d 331 (7th Cir.1969), where we held that the district court abused its discretion in dismissing the plaintiffs' action without prejudice where it was apparent that the defendant was entitled to summary judgment since the plaintiff had failed to file a response to the defendant's summary judgment motion. In this case, the district court expressed a "sixty percent comfort" in its prior rulings holding that the United States had a proper claim for injunctive relief under the Refuse Act, Clean Water Act and section 106 of CERCLA. Thus from our review of the record, including the district court's comments, we certainly are far from convinced that the appellants would have obtained a favorable ruling from the district court. Further, the government agreed to execute a covenant not to sue for any claims other than the recovery of the cleanup costs, as a condition of dismissal, and thus is prevented from again bringing another action seeking the same injunctive relief and civil penalties in this fact situation. The appellants have, in effect, achieved their purpose in having the injunctive relief claims dismissed.
 
 
 25
 The appellants also argue that had this case proceeded to trial, they would have prevailed since the government did not have evidence sufficient to establish that the PCB in the Waukegan harbor was causing harm sufficient to justify the expected cost of the removal of the PCB from the harbor. Specifically, the appellants point to the government's admission in September 1982 that the government knew of no person who had as of that point in time suffered any ailments due to the PCB in the harbor. Since our standard of review in this case requires that we affirm the district court decision unless we find "that the discretion of the trial judge was abused" in dismissing this action without prejudice on the condition that the government execute a covenant not to sue for injunctive relief, Tyco Laboratories, Inc., 627 F.2d at 56, we are not in the position to assess the relative merits of either the appellant's or the government's position as to the alleged harm, or anticipated future harm, caused by the PCB in the harbor.[9] But it is important to note that while the government did admit that it did not have scientific evidence at that particular point in time that the PCB in the harbor had caused harm to humans, it did not admit that the PCB then present would not cause a significant health problem to humans in the future, or that the PCB did not present a present risk to the ecological life of the harbor or Lake Michigan, or that the PCB will not harm the fish and aquatic life in the area.
 
 
 26
 Further, even if we acceded to the appellant's request and reversed the district court's decision to dismiss this case without prejudice and the court, on remand, allowed this case to proceed to trial, we have serious doubts as to whether a trial on the claims presently before the court would be proper since the government has commenced its cleanup effort. Specifically, the government's complaint asked for injunctive relief requesting that the appellants be directed to remove the PCB sediments from the bed of the harbor immediately; but because of the extensive litigation and the serious problems (potential harm to humans and the environment in the future) posed by the contaminated waste in the water, the government commenced the process of removing the PCB sediments from the harbor. See Outboard Marine Corp. v. Thomas, 773 F.2d 883 (7th Cir.1985). Thus, there no longer exists a valid reason for the requested injunctive relief. Conversely, if the government decides to wait until after the proposed trial to commence the removal operation, a serious question would exist as to the district court's jurisdiction over the merits of the appellant's case that the cost of the government's proposed remedy was not justified by the alleged harm presented by the PCB in the Waukegan harbor. Courts that have addressed the issue of a trial court's jurisdiction to review the appropriateness of the EPA's removal efforts have held that CERCLA does not authorize pre-enforcement judicial review of the EPA's R.O.D. CERCLA does not give the United States District Courts jurisdiction to review the EPA's R.O.D. prior to enforcement. Rather, these courts have held that the jurisdiction rests with the trial court only after the EPA has enforced the R.O.D. and the government subsequently sues under CERCLA section 107, 42 U.S.C. Sec. 9607, to recover the cleanup costs incurred in enforcing the R.O.D. Wheaton Industries v. U.S. E.P.A., 781 F.2d 354, 356 (3d Cir.1986) (citing Lone Pine Steering Committee v. U.S. E.P.A., 777 F.2d 882 (3d Cir.1985) for the proposition that "judicial review is not available under CERCLA until the EPA files suit for reimbursement of its costs, as authorized by section 107, CERCLA, 42 U.S.C. Sec. 9607."); see also J.V. Peters & Co., Inc. v. U.S. E.P.A., 767 F.2d 263, 265 (6th Cir.1985).
 
 
 27
 Finally, the appellants will not be deprived of any defense if the EPA later sues for recovery of its removal costs and thus will not be prejudiced if the government subsequently brings a cost recovery action.[10] See Puerto Rico Maritime Shipping Authority v. Leith, 668 F.2d 46, 50 (1st Cir.1981). It appears from the record that had the injunctive relief action proceeded to trial the appellants might have argued in their defense that any alleged harm from the PCB in the Waukegan harbor did not justify the anticipated cost of removal. Section 107(a), 42 U.S.C. Sec. 9607(a), (authorizing the government to remove the hazardous waste) states that the party responsible for the presence of the hazardous waste shall bear the cost of removal "not inconsistent with the national contingency plan." The national contingency plan is described in 42 U.S.C. Sec. 9605 and requires that the remedial action taken by the government be cost-effective. 42 U.S.C. Sec. 9605(7). Thus, the procedure used by the government to recover its cleanup costs pursuant to section 107(a), 42 U.S.C. Sec. 9607(a), will permit the appellants to raise a cost-effectiveness defense should they desire.
 
 
 28
 3. Effort and expense in preparing for trial.
 
 
 29
 The appellants also argue that they have been "put to extraordinary expense and effort" in defending this lawsuit for the past seven and one-half years. While we note that the appellants have incurred substantial costs and attorney fees in defending this action,[11] the district court did impose conditions on the parties to the dismissal in order to minimize the cost to the appellants. Specifically, the court awarded Monsanto and OMC costs, pursuant to 28 U.S.C. Sec. 2412(a) in the amount of $45,138 and $68,893, respectively.[12] Further, the court granted the government's motion to dismiss its complaint without prejudice only upon the condition that the government and the State of Illinois each execute a covenant not to sue for the counts contained in its complaint; thus, the defendants will not again be forced to litigate the claims seeking injunctive relief. Since the materials accumulated during discovery and the administrative process are not contained in the record we are unable to determine which of these materials may be of use to the defendants should the government commence an action for the recovery of the removal costs. But the parties agreed at oral argument that the anticipated defense at the cost recovery trial would be similar to the defense that would have been employed at the trial for injunctive relief. Thus the appellants' work product might very well be useful if and when the government brings its action for recovery of removal costs and the appellants' efforts and expenses incurred in preparing for the injunctive relief trial will not have been wasted. See Puerto Rico Maritime Shipping Authority, 668 F.2d at 50; cf. Cauley v. Wilson, 754 F.2d 769, 772 (7th Cir.1985).
 
 
 30
 4. Unfavorable publicity.
 
 
 31
 The appellants finally argue that for years they have been forced to endure the unfavorable publicity surrounding the allegations that they are responsible for the PCBs in the Waukegan harbor, and contend that the government's voluntary dismissal "on the eve of trial eliminated [their] chance[] to obtain a fair hearing on the accusations." OMC Br. at 24. This argument is speculative and, at best, a red herring. The district court correctly noted that "[t]his concern, while its importance should not be underestimated, is not sufficient to justify an unwarranted trial" at this stage of the proceedings. Outboard Marine Corp., 104 F.R.D. at 413; see also Louis v. Bache Group, Inc., 92 F.R.D. 459, 461 (S.D.N.Y.1981). Further, the appellants have failed to provide this court with evidence in the record demonstrating how they have suffered due to any unfavorable publicity surrounding this litigation. Even if we were to accept this assertion of unfavorable publicity, as noted in this opinion the district court is granted wide latitude in determining whether or not to grant a motion to dismiss without prejudice and we cannot state that the district court abused its discretion simply because the parties, Monsanto and OMC, who caused the PCB problem in the harbor, may suffer unfavorable publicity. Obviously, the courts cannot exercise control over the media when it exercises its First Amendment Free Press right to inform the public of the potential harm arising from the hazardous waste in the harbor. If the appellants are upset with the press' coverage of this matter, they can present this argument to the press after the cost recovery trial.
 
 
 32
 After reviewing the record in this case, we hold that the district court did not abuse its discretion in dismissing the government's action without prejudice on the condition that the government and the State of Illinois execute a covenant not to sue for injunctive relief or civil penalties.
 
 III
 
 33
 In the last section of its brief, OMC contends that the district court's "modification of its initial dismissal with prejudice violated Rule 41(a)(2) and was an abuse of discretion." OMC Br. at 29. OMC notes that because of the expense of litigating this case, the district court initially refused to grant the government's motion to dismiss without prejudice. Rather, the court stated that the dismissal would be with prejudice as to the claims contained in the government's complaint but that the dismissal would not affect the government's subsequent cost-recovery action since this claim "could not have been brought in this [injunctive relief] action." Outboard Marine Corporation Co., 104 F.R.D. at 411. Citing a line of cases holding that the government may bring an action seeking recovery of costs for the removal of hazardous waste as soon as it has incurred its initial cleanup costs,[13] OMC argues that the district court erred when it assumed that the cost-recovery action could not have been brought by the government when it filed its second amended complaint requesting injunctive relief since the government had already incurred costs that could be recovered under Sec. 107 of CERCLA. The appellants also argue a claim for injunctive relief under section 106 and a claim for recovery of costs under section 107 of CERCLA are the same for purposes of res judicata analysis. Thus, OMC argues that "any dismissal of this case under Rule 41 must be with prejudice [and] [s]uch dismissal would have to include a cost-recovery action under Superfund Sec. 107." OMC Br. at 29. Although the position taken by OMC in its brief is not entirely clear, we interpret OMC as requesting that we reverse the district court decision to dismiss without prejudice, reinstate its original order dismissing this case with prejudice, and dismiss the entire action holding that the anticipated cost-recovery action is precluded by the rules of res judicata.
 
 
 34
 From our review of the totality of the record in this proceeding, the district court's original opinion dismissing this action with prejudice, except for the reservation allowing the government to pursue a future cost-recovery action, and the court's subsequent modification of that decision to dismiss the government's complaint without prejudice on the condition that the government execute a covenant not to sue, it is evident that the intent of the district court was to prevent the government from changing the course of litigation and again seeking the same type of injunctive relief from the appellants in the same fact situation. The court obviously had no intention of preventing the government from later seeking recovery costs incurred in the removal of the PCB's from the Waukegan harbor; thus saving the taxpayers from being saddled with the interim cleanup expense. The mere fact that the district court allowed the government to later pursue this second action seeking recovery costs is not in and of itself prejudicial to the defendants. See Quad/Graphics, Inc. v. Fass, 724 F.2d 1230, 1233 (7th Cir.1983); Puerto Rico Maritime Shipping Authority, 668 F.2d at 50; Stern, 452 F.2d at 214 (noting that "the prospect of a second lawsuit should not [in and of itself] bar a voluntary dismissal...."); cf. Restatement of Judgment (Second), Sec. 26(1)(b) (noting that the principles of res judicata do not apply when the "court in the first action has expressly reserved the plaintiff's right to maintain the second action....").
 
 
 35
 Since the district court's final decision was to dismiss this action without prejudice upon the condition that the government and the State of Illinois execute a covenant not to sue for injunctive relief based upon the same fact situation, to reach the res judicata issue we would initially have to hold that the district court abused its discretion in dismissing the complaint without prejudice before reaching the issue of whether the dismissal with prejudice of the section 106 CERCLA claim would bar the section 107 cost recovery action. We previously held that the court did not abuse its discretion; thus, we need not reach the issue of whether the section 107 cost recovery action would be barred by res judicata. Further, since the district court never explicitly ruled on the res judicata issue as to the interrelationship between section 106 and 107, this issue is not properly before this court at this time.
 
 
 36
 The decision of the district court is AFFIRMED and costs are awarded to the government on this appeal.
 
 
 
 [1]
 Fed.R.Civ.P. 41(a)(2) provides:
 "(2) By Order of Court. Except as provided in paragraph (1) of this subdivision of this rule, an action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper. If a counterclaim has been pleaded by a defendant prior to the service upon him of the plaintiff's motion to dismiss, the action shall not be dismissed against the defendant's objection unless the counterclaim can remain pending for independent adjudication by the court. Unless otherwise specified in the order, a dismissal under this paragraph is without prejudice." (Emphasis added).
 
 
 [2]
 The State of Illinois' intervention into this case was not by agreement but with some acrimony. As noted by the district court:
 "Illinois moved to intervene in this action, but its motion was denied by order dated May 29, 1979. Illinois appealed, and the Court of Appeals held that Illinois could intervene as of statutory right. State of Illinois v. Outboard Marine Corporation, 680 F.2d 473, 480-81 (7th Cir.1982); see also State of Illinois v. Outboard Marine Corporation, 619 F.2d 623, 630-32 (7th Cir.1980), vacated and remanded, 453 U.S. 917, 101 S.Ct. 3152, 69 L.Ed.2d 1000 (1981). Illinois has also filed its own action, which the court dismissed without prejudice because it duplicated Illinois' claims in this action. State of Illinois v. Outboard Marine Corporation, No. 78 C 3187 (N.D.Ill. Sept. 30, 1982)."
 United States v. Outboard Marine Corp., 104 F.R.D. 405, 414 (N.D.Ill.1984).
 
 
 [3]
 PCB is listed as a toxic pollutant pursuant to section 307(a) of the Clean Water Act, 40 C.F.R. 129.4, and is designated as a hazardous substance pursuant to section 311 of the Clean Water Act, 40 C.F.R. 116.4
 
 
 [4]
 OMC alleged that CERCLA section 106 was merely a jurisdictional statute that did not provide for substantive liability; and, assuming that the statute did allow for substantiative injunctive relief, the EPA had failed to plead sufficient facts to establish that the presence of PCB in the Waukegan harbor posed an "imminent and substantial endangerment" within the meaning of the statute. The district court, however, rejected each of these arguments
 
 
 [5]
 The NPL is based upon Hazard Ranking System ("HRS") that represents a composite score that is "used in evaluating the relative potential of uncontrolled hazardous substances facilities to cause health or safety problems, or ecological or environmental damage." 47 Fed.Reg. 31220 (1982)
 
 
 [6]
 The appellants participated in this administrative process, attending the public meetings and submitting their views during the respective comment periods
 
 
 [7]
 The on-site designation meant that the PCB removed from the harbor would be stored on OMC's property; while the remainder would be stored at another location, not on OMC's property
 
 
 [8]
 CERCLA section 106 requires that there be "an imminent and substantial endangerment to public health or welfare or the environment"; on the other hand, CERCLA sections 104 and 107 do not contain this requirement
 
 
 [9]
 Indeed, the parties have not presented the administrative record or a summary of the evidence collected to this date concerning the potential harm that may be caused by the PCB
 
 
 [10]
 Indeed, the parties recognized at oral argument that the appellants' defenses that would have been asserted at the trial assessing the appropriateness of the government's request for injunctive relief would be available if, or when, the government sues for recovery of its cleanup costs
 
 
 [11]
 As previously noted, the "cause" of the expense and effort put forth by the appellants cannot exclusively be attributed to the federal government
 
 
 [12]
 The court awarded costs to OMC pursuant to 28 U.S.C. Sec. 2412(a), noting that courts have held a voluntary dismissal without prejudice is tantamount to a judgment for the defendant for purposes of awarding costs. See C. Wright & A. Miller, Federal Practice and Procedure, Civil Sec. 2366, 179-80 (1971). The court awarded costs to Monsanto as a prevailing party since it had earlier been dismissed as a defendant. See United States v. Outboard Marine Corp., 549 F.Supp. 1032 (N.D.Ill.1982). The court, however, noted that it may have to require a downward adjustment of this cost award if the appellants are able to use the information acquired through discovery to defend themselves at the cost-recovery trial
 
 
 [13]
 OMC cites New York v. General Electric Co., 592 F.Supp. 291 (N.D.N.Y.1984) and United States v. Allied Chemical Corp., 587 F.Supp. 1205 (N.D.Cal.1984)